HARDY, Judge.
This is a suit ex contractu, and plaintiff prayed for a money judgment alleged to be due as the balance under an agreement for the drilling of an oil and gas well, together with lien costs, attorney’s fees, etc. Under order of the court a writ of provisional seizure was issued and an oil and gas lease of defendant affecting certain described lands located in Red River and De Soto Parishes was seized. The answer of defendant, after denying the material allegations and claims of plaintiff’s petition, asserted a reconventional demand for damages resulting from plaintiff’s alleged breach of contract.
After trial there was judgment in favor ■of plaintiff in the sum of $7,636.00, less a credit of $3,500.00, with interest, attorney’s fees and the lien cost; further judgment recognizing plaintiff’s lien and privilege on the property provisionally seized, and, finally, judgment rejecting defendant’s re-conventional demand. From this judgment defendant has perfected a suspensive appeal. Plaintiff has answered the appeal seeking an increase in the amount of the judgment.
The resolution of this appeal depends exclusively upon the interpretation of the contract between the parties in the light of-the material and relevant facts.
Under date of June 25, 1958, the defendant, Robinson Research, Inc., as owner, and the plaintiff, E. B. Duncan Drilling & Well Servicing Company, Inc., as contractor, executed a printed form “Standard Drilling Contract” setting forth detailed provisions under which the contractor agreed to drill a well in search of oil or gas on a described location in the Bull Bayou Field of De Soto Parish, Louisiana. The lengthy and somewhat involved contract includes a multitude of general provisions and detailed specifications. We will restrict our recapitulation of the contract provisions to those which are appropriate to the established facts. The contract depth of the well was fixed at 2,900 feet, or the Paluxy formation, but restricted to a maximum depth of 3,000 feet. The cost of drilling was fixed at $2.00 per foot, compensation for work performed on a day work basis at $22.00 per hour and the stand-by time rate at $15.00 per hour. Additionally, compensation for shut-down time for the repair or maintenance of the contractor’s rig while performing day work was fixed at $250.00 per day. Plaintiff’s claim seeking recovery of the sum of $11,314.00 was comprised of three items:
(1). The sum of $4,000.00, representing $2.00 per foot for a minimum depth of 2,000 feet in accordance with the contract provisions;
(2). $6,314.00 representing compensation for 287 hours of day work performed at the rate of $22.00 per hour, and
(3). $1,000.00 for four days shut-in charges at $250.00 per day while the contractor’s rig was undergoing repairs while on a day work schedule.
Responsive to the items of plaintiff’s claims as above set forth, the district judge, for the reasons shown by his written opinion, rejected the claim for $1,000.00 *97 for the four day shut-in charge but allowed:
(1). Recovery in the sum of $2,136.00 for 1,068 feet actually drilled at $2.00 per foot; and
(2). $5,500.00 for 250 hours day work at $22.00 per hour.
The facts are that drilling operations were commenced on July 19, 1958; at a depth of 837 feet gas was encountered, but, on orders from defendant owner, plaintiff contractor continued drilling. During the early morning hours of July 21st, at a depth of 1,068 feet, plaintiff’s driller noted that he was losing circulation and left the location for the purpose of procuring an additional supply of mud or control materials. During his absence the well blew out and caught fire. After a brief period of time the fire was extinguished, but considerable effort was required through the use of control materials and a home-made blowout preventer to shut down the well.
Plaintiff’s statement, filed in evidence, shows that the well was sealed off on July 24th and remained shut in until drilling operations were resumed on or about August 11th. The same statement shows that on August 2nd the well was killed and plaintiff installed control equipment, including a manufactured blowout pre-venter. The period of time following the blowout on July 21st until drilling operations were resumed on August 11th was occupied by the contractor in bringing the well under control, effecting repairs to his drilling rig and machinery damaged by the fire, mixing mud and conditioning the hole for the resumption of drilling. The time employed by the contractor in the above described operations constitutes the bulk of his claim based upon day work and shut-in charges. After the resumption of drilling operations the contractor again encountered difficulty resulting from loss of circulation, and, after twenty-four hours effort in attempting to correct this condition, he notified the defendant owner, through its President, Mr. Randall, that he would be unable to complete drilling operations to the contract depth. Upon receipt of this information the contractor was instructed to complete the well at the depth of 1,068 feet, which operation he concluded on August 19th.
The opposed contentions of the parties may be briefly stated. Plaintiff urges that he complied with the original contractual provisions and that the difficulties encountered which prevented the completion of the well in accordance with the contract constituted abnormally difficult and hazardous conditions resulting from loss of circulation. On the other hand, defendant claims that the failure of normal completion of the well resulted from plaintiff’s breach of contract in neglecting to equip the rig with a blowout preventer and the further failure to maintain on hand and readily available an adequate and effective supply of control materials.
Inasmuch as both parties rely upon the original contract provisions in support of their opposed contentions, it is necessary that we examine such portions of the contract as are relevant to a determination of this issue.
Under Article 10.1 the contractor was obligated to perform all work under the terms of the contract with “ * * * due diligence and care and in a good and workmanlike manner * * Article 10.2, which is particularly important and upon which defendant heavily relies, reads as follows:
“Contractor shall maintain well control equipment in good condition at all times and shall use all reasonable means to control and prevent fires and blowouts and to protect the hole.”
It is the position of defendant that the above provision required the contractor to furnish a blowout preventer and to maintain readily accessible control materials designed not only to reduce excessive pressure but also to prevent loss of circulation. On behalf of plaintiff it is argued that the *98 above quoted provision is modified by a specification contained in Exhibit “A,” an addendum to the principal contract denominated as “SPECIFICATIONS AND SPECIAL PROVISIONS.” Plaintiff particularly relies upon Article 5 of the Exhibit which we regrettably find it necessary to set forth in full for the purpose of clarification :
“5. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY CONTRACTOR
“Tire machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the location at the expense of Contractor unless otherwise noted hereon and otherwise provided for in Par. 7 hereof.
“5.1 Drilling Rig.
“Complete .drilling rig, designated by Contractor as bis rig No. One , the major items of equipment being: Drawworks: . Franks 5000 (Make and Model) Engines: Make, Model, and H. P. - •No. on Rig -- Pumps: Make and Size - Auxiliary Pump: Make, Size and Power-Boilers: Number, Make, H. P. and W. P.Steam Drilling Engine: Make and Size-Derrick or Mast: Make, Size and Capacity-Substructure: Size and Capacity - Drill Pipe: Size -in. -ft.; Size-in-ft.; Size-in-ft. ■ Drill Collars: Number and Size-Blowout Preventers: Number, Make, Model and H. P. -
The plaintiffs contention is that he was not specifically required under the above quoted article to furnish a blowout preventer. We think this position is untenable since it is clear that the description of the rig was intended to include all necessary appurtenances thereto. It could as well be argued that the contractor was not required to furnish engines or any other items of equipment which would be absolutely essential to the operation of the rig, because, as shown above, they were not specifically noted. Under this circumstance, we find no difficulty in accepting Article 10.2 of the principal contract, above quoted, as controlling the obligation of the contractor. Certainly, under the factual circumstances of this case, the use of a blowout preventer and other well control equipment constituted reasonable means which should have been available for the purpose of preventing the very circumstance that occurred.
In connection with the above conclusion, it is also pertinent to comment upon the fact that Statewide Order No. 29-B of the State Department of Conservation, in effect at the time of the operations involved in this case, required the use of blowout pre-venters with respect to drilling operations. Mr. J. L. Patrick, Petroleum Inspector for the State Conservation Department in charge of supervision of drilling in the Bull Bayou Field, was tendered as a witness by plaintiff. Mr. Patrick testified that he did not know that the Lelong Well #2 being drilled by plaintiff for the defendant owner was not equipped with a blowout preventer until after the occurrence of the blowout and the resulting fire; that he was without the authority to relax or refuse to enforce this particular provision of the Statewide Order, but that it was impossible, because of the extent and pressure of his many duties, to ascertain and take action with reference to every violation of the order. The witness refused to testify, although this was obviously one of the purposes for which he was called by plaintiff, that it was the general custom to drill shallow wells in the Bull Bayou Field without furnishing blowout preventers.
The record fails to establish whether the insurmountable difficulty in completing the well to the contract depth was caused by the blowout, as contended by defendant, or by loss of circulation, as urged by plaintiff. Both the expert and lay testimony on this point is lacking in certainty and fails to preponderate in favor of either party. In the final analysis, however, we think the acceptance of either reason would justify the fixing of responsibility upon the plaintiff. If the blowout caused the condition which prevented completion of the *99 well, then the fault is upon the contractor, for, as above noted, we have concluded that it was his obligation under the contract to furnish a blowout preventer, which, according to the evidence in the case, would have prevented such an occurrence. If the loss of circulation was responsible, then it is equally clear from the facts established by the record that the contractor was negligent in failing to provide and have on hand an adequate supply of control materials which would, except in most unusual circumstances, have permitted the restoration of circulation, and, in all probability, would have served to prevent the blowout. Under a specific provision in Exhibit “A” the owner was required to bear the expense including transportation of drilling mud, chemicals, lost circulation materials and other additives. However, the control program was the obligation of the contractor. The record incontrovertibly establishes the fact that the contractor failed to provide an adequate supply of the above enumerated materials. As pointed out in our statement of facts, it was only after plaintiff’s driller noted the loss of circulation that he left the location fo.r the purpose of procuring a supply of chemicals and additives, and during his absence the blowout occurred.
To sum up, it is our opinion that plaintiff contractor failed to exercise due diligence, reasonable care and workmanlike procedure in connection with his operations as required by the contract.
Under our interpretation of the contract and the findings of fact relevant thereto, it follows that plaintiff’s claims for day work and shut-in time should have been rejected in their entirety. While it is true that plaintiff’s statement shows twenty-four hours of day work on August 12th as the result of lost returns and conditioning the hole, reference to the contract discloses that he was required to furnish this amount of time under such conditions without being entitled to the day work charge. On this point it is pertinent to comment that the contractor required plaintiff to furnish daily reports of operations to the owner. Notwithstanding the somewhat equivocal testimony of the President of plaintiff corporation that reports were furnished, this was positively and preponderantly refuted by the testimony of Mrs. Doris Weaver, Secretary to Mr. Randall, President of the defendant corporation, that such reports were not furnished. Counsel stipulated that the testimony of Mr. Randall, had he appeared as a witness, would, in all respects, have been the same as that of Mrs. Weaver. We further observe that the purported daily report of August 12th is the only-one which gives any evidence of loss of circulation which we have above discussed as the principal defense of plaintiff against the breach of contract charges.
The report of August 12th concludes with the notation that the well was rigged for a log and sidewall core and was waiting on orders. As the result of information concerning the existing condition, the defendant owner issued orders to complete the well at its depth of 1,068 feet, which orders were carried out by the contractor.
Defendant’s reconventional claims, founded upon alleged breach of contract, must be rejected. The original contract contained definite default provisions and the procedures available to the owner in the event of the occurrence of such default. The owner did not choose to avail himself of the remedies provided, but, as above stated, voluntarily ordered the contractor to complete the well at the attained depth of 1068 feet. This agreement had the effect of annulling the original contract provisions and served to preclude the recovery of damages fo.r the breach thereof.
The only remaining issue involves plaintiff’s claim to the sum of $4,000.00 under the 2,000 foot minimum depth at a rate of $2.00 per foot, as provided in the original contract. Even as the defendant is barred from the recovery of damages for breach of the original contract because of his decision to complete the well at the depth of 1,068 feet, so the contractor is barred from claiming the minimum drilling *100 compensation under the original contract because of his acceptance of and acquiescence in the owner’s instructions to complete the well at a lesser depth. Since we have found that the contractor was responsible for the conditions which necessitated this action, certainly, he would not be entitled to additional compensation.
The only recovery to which plaintiff is entitled would be the amount represented by the footage rate of $2.00 for the actual depth of completion at 1,068 feet, that is, the sum of $2,136.00. It is not disputed that defendant owner had made an advance payment of $3,500.00 against the contract drilling cost, and, therefore, is entitled to recover the difference between the above amounts.
For the reasons assigned the judgment appealed from is annulled, set aside and •reversed, and
IT IS.NOW ORDERED, ADJUDGED AND DECREED that plaintiff’s demands be and they are hereby rejected, and that there be judgment in favor of defendant, Robinson Research, Inc., and against the plaintiff, E. B. Duncan Drilling & Well Servicing Company, Inc., in the principal sum of One Thousand Three Hundred Sixty-four ($1,364.00) Dollars, with interest thereon at the legal rate from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the writ of provisional seizure issued herein be and it is recalled, and that the lien and privilege recorded by plaintiff affecting
That certain oil and gas lease recorded in the Conveyance Records of DeSoto Parish at Book 229, Page 257, and covering and affecting Section 25, Township 12 North, Range 11 West, and Section 30, Township 12 North, Range 10 West, lying in DeSoto Parish, and partly in Red River Parish, Louisiana, together with oil and gas wells located thereon and including all the equipment used in the production and marketing of mineral products therefrom, and with all oil now in storage and all oil and/or gas which may be produced in the future.
be and it is ordered cancelled and erased from the public records.
• All costs of both courts are assessed against plaintiff-appellee.